F.G. ARMSTRONG, Trustee of Equity Liquidating Trust, Plaintiff-Appellant,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendant-Appellee.

No. 84–2271.

United States Court of Appeals, Tenth Circuit.

July 21, 1986.

■

5. 28 U.S.C. § 2680(h).

W. Chris Coleman (McAfee & Taft, A Professional Corporation, with him on brief, of counsel), Oklahoma City, Okl., for plaintiff-appellant.

Linda G. Scoggins, of Spradling, Alpern, Friot & Gum, Oklahoma City, Okl. (Jeffrey H. Contreras with her on brief), for defendant-appellee.

Before SEYMOUR, TACHA and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

F.G. Armstrong, Trustee of Equity Liquidating Trust, formerly Equity Mortgage Co., Inc. (Equity), brought suit against Federal National Mortgage Association (FNMA) in the United States District Court for the Western District of Oklahoma. Equity sought recovery of the sum of $25,-802.53, which sum, according to Equity, was "wrongfully extracted" from it by FNMA. This alleged wrongful extraction resulted from FNMA imposing a "transfer fee" in connection with Equity's sale of its loan-servicing business to Mager Mortgage Co. (Mager). Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Trial of the case was to a jury, which returned a verdict in favor of Equity and against FNMA in the amount asked for, namely, $25,802.53. Thereafter, FNMA filed a motion for judgment n.o.v., which motion, after hearing, was granted. The trial court held, in effect, that, under the contract between the parties, FNMA had a right, as a matter of law, to impose a transfer fee in connection with the sale by Equity of its business to Mager. Accordingly, the trial court set aside the verdict of the jury and entered judgment for FNMA. Equity appeals. We affirm.

Equity was a mortgage company in Blackwell, Oklahoma, engaged in the business of making loans for the purchase of residential properties, and taking, in exchange, mortgages on such homes. The funds used for the loans did not actually come from Equity, but from so-called "secondary investors," such as FNMA, an agency of the federal government. FNMA invests in the home mortgage market by

purchasing home mortgages from qualified financial institutions, such as Equity, who originate the mortgages. Accordingly, FNMA, as the secondary, or real, investor would purchase a note and mortgage from Equity.

FNMA would thereafter enter into a servicing contract with Equity whereby Equity, for a fee, would "service" the loan. Servicing a loan includes generally keeping track of the mortgaged property, making certain the payments on the note are kept current, inspecting the mortgaged property, making certain that the property is insured, that taxes are paid on time, and the like. Equity not only serviced loans for mortgages sold to FNMA, but also serviced loans for other secondary investors to whom they had sold mortgages, including insurance companies, banks, and county bond authorities. There was a written "Servicing Contract" between Equity and FNMA, about which more will be said later.

In the fall of 1981, the shareholders in Equity decided to liquidate and accordingly began to search for a purchaser of their entire portfolio of loans, including the loans and mortgages which they serviced for FNMA. These efforts to sell culminated in a sale in July, 1982, by Equity of its entire portfolio to Mager. It was in connection with this sale that FNMA demanded payment of a transfer fee in exchange for its consent to the transfer. The amount originally requested was approximately $52,000, which sum, after negotiation between the parties, was reduced to $25,802.53. Equity then paid FNMA the sum of $25,802.53, under protest. Equity's position was that its payment was under "economic duress," since the purchaser of its portfolio, Mager, would only take the entire portfolio, not Equity's portfolio less the servicing contracts it had with FNMA.[1] In this regard, FNMA's position was that this was a "voluntary payment" by Equity resulting from

a negotiated settlement of the dispute. In our view, Equity's letter protesting the payment protected Equity's right to later challenge imposition of the transfer fee.

As indicated, there was a written servicing contract between Equity and FNMA. This was a pre-printed form prepared by FNMA. The Servicing Contract itself makes no mention of a transfer fee. However, and most importantly, the contract does provide that Equity may not transfer or assign its interest in the servicing contract unless it has the written consent of FNMA.

Paragraph 1 of the Servicing Contract between Equity and FNMA provides, *inter alia,* as follows:

*Each of the following documents is hereby incorporated in and made part of this Contract,* provided that Servicer is authorized by paragraph 15 of this Contract to service the type(s) of mortgages covered by such document: *the FNMA Home Mortgage Servicing Contract Supplement;* and the FNMA Conventional Multifamily Servicing Contract Supplement. *Such supplements, as published and distributed by FNMA, and as they shall exist and be amended or supplemented from time to time by FNMA, including all amendments and supplements thereto and all instruments succeeding or superseding the aforesaid supplements in whole or in part, in every form whatsoever, are collectively referred to in this Contract as the "Servicing Supplement."* (emphasis added)

Paragraph 7 of the Servicing Contract provides as follows:

7. NO ASSIGNMENT OF CONTRACT; CONDITIONS UPON CONTINUATION. This Contract shall be construed as being in the nature of a personal service agreement *and accordingly may not be assigned by Servicer*

---

1. Under its Servicing Contract with FNMA, Equity could have terminated its servicing obligations to FNMA on notice. However, it did not do so and preferred to sell that part of its portfolio, along with the rest, to Mager. Equi-

ty's interest under its Servicing Contract with FNMA was obviously an asset of considerable value, thus its disinclination to cancel or terminate.

*under any circumstances. Servicer also may not assign its responsibility for servicing individual mortgages except as provided in paragraph 8 of this Contract.* Servicer hereby acknowledges and agrees that servicer has paid no monetary consideration to FNMA for FNMA's approval of Servicer as a qualified mortgage servicer except for an application fee intended to reimburse FNMA for expenses incurred in reviewing Servicer's application for approval, that this Contract has no value to Servicer except for the compensation to be paid, and any termination fee which may be paid, to Servicer by FNMA pursuant to the terms of this Contract and, furthermore, that Servicer may continue to enjoy the benefits to be derived from this Contract only so long as there is no substantial change in the ownership or legal status of Servicer, except as such change is approved by FNMA. (emphasis added)

Paragraph 8 of the Servicing Contract provides as follows:

8. ASSIGNMENT OF RESPONSIBILITY FOR SERVICING MORTGAGES. *Servicer,* at any time prior to FNMA's giving Servicer notice of termination pursuant to paragraph 10 of this Contract, *upon obtaining FNMA's prior written consent,* may assign its responsibility for servicing all or any part of the FHA/VA mortgages which Servicer is then servicing for FNMA. Any assignment shall be made to a transferee servicer which is acceptable to FNMA for the servicing of the mortgages assigned and which has entered into a servicing contract with FNMA. Servicer and the transferee servicer shall execute such documents and perform such acts as FNMA reasonably may require to evidence and perfect such assignment. *Servicer may not assign its responsibility for servicing conventional mortgages except as permitted by FNMA, as provided in the Servicing Supplement.* (emphasis added)

Prior to July, 1981, FNMA did not impose a transfer fee when one of its servicers assigned or transferred its interest or responsibility under a servicing contract to another. Also, FNMA's consent to an assignment of this sort was apparently given, as a matter of course, once FNMA determined, to its satisfaction, that the one to whom the sale was being made was a responsible and capable servicer. However, in July, 1981, there was a change in policy, and FNMA began to charge a transfer fee in connection with transfers of for-profit servicing responsibilities initiated by lenders such as Equity.[2] To that end, in October, 1981, FNMA sent out FNMA Program Announcement No. 3 advising lenders that FNMA would thereafter impose a transfer fee for such transfers of servicing. This document notified lenders that it amended the FNMA Home Mortgage Servicing Contract Supplement to the same extent as if incorporated in the Supplement. It is agreed that long before Equity sold its business to Mager, it received a copy of the FNMA announcement, and, although inquiry was invited, made no inquiry.

As stated, Equity sold its business to Mager in July, 1982, although negotiations between the parties took place over a period of several months preceding the signing of the papers. By letter of August 9, 1982, Equity notified FNMA of its intent to transfer its interest under the Servicing Contract with FNMA to Mager, subject to FNMA's approval. Equity specifically asked FNMA to approve the proposed sale by August 15, 1982, and to advise if any fees, charges, or other requirements were necessary.

By its agreement with Mager, Equity transferred to Mager all of its (Equity's) servicing contracts which constituted some 2,100 individual loans, of which some 500 were being serviced for FNMA, and totalled approximately $66,000,000 in unpaid principal, of which FNMA-held mortgages represented some $17,000,000. Under its contract with Mager, Equity was to receive approximately 1.72% of the principal value

---

**2.** FNMA, at that time, was having cash flow problems, and in order to improve its financial position, it made a business judgment to start imposing a transfer fee on transfers by servicers of their interests in their Servicing Contracts with FNMA.

of the mortgage portfolio which it was then servicing, which was roughly $1,121,900.

In response to Equity's letter of August 9, 1982, FNMA initially asked for a transfer fee of over $52,000.[3] After numerous discussions between the parties, the transfer was reduced to $25,802.53, which amount Equity paid by check accompanied by a letter protesting payment. About one year after Equity paid the transfer fee to FNMA, Equity instituted the present proceeding.

As stated, the jury returned a verdict in favor of Equity. However, the trial court, on motion, set aside that verdict and entered judgment n.o.v. for FNMA, believing that, under the contract between the parties, FNMA had a contractual right to impose a transfer fee. On appeal, in its reply brief, Equity argues for the first time that the trial court did not have the power to grant a motion for judgment n.o.v. since FNMA had not moved for a directed verdict at the close of all the evidence as required by Fed.R.Civ.P. 50(b). It is true that FNMA did not move for a directed verdict at the close of all the evidence. However, at the conclusion of Equity's case-in-chief, FNMA did move for a directed verdict on the ground that the contract between the parties granted FNMA the right to impose a transfer fee in exchange for its consent to a sale by Equity of its FNMA portfolio to Mager. In denying that motion, the trial court commented as follows:

> THE COURT: Well, that motion may just well be a good motion, but I'm not prepared to grant it. I haven't finished studying your brief, let alone I haven't looked at any cases that he suggests, and I intend to do that. But I'm going to deny your motion without prejudice to reverse myself.

■ After the trial court denied FNMA's motion for a directed verdict, it called but one witness, J.M. Benavides, an administrator with FNMA, who had already been called by Equity as one of its witnesses.

The case was then submitted to the jury, with FNMA failing to renew its motion for a directed verdict. Under the described circumstances, we do not believe that FNMA's failure to move for a directed verdict at the close of all the evidence precluded the trial court from entertaining, and granting, a motion for judgment n.o.v.

In denying FNMA's motion for a directed verdict at the close of Equity's evidence, the trial judge indicated quite clearly that he intended to keep the issues raised by the motion open when he said that the "motion may just well be a good motion, but I'm not prepared to grant it," and that he wanted to study the briefs and read the cases and would therefore deny the motion "without prejudice to reverse myself." In this regard, a case quite similar to the instant one is *Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285 (8th Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983), where the Eighth Circuit stated that "a court may nevertheless grant judgment n.o.v. if the evidence introduced after the motion for a directed verdict [at the close of the plaintiff's case] was brief, and the court somehow indicated that renewal of the motion would not be necessary to preserve the right to move for judgment n.o.v." *Id.* at 294. *See also Bohrer v. Hanes Corp.*, 715 F.2d 213, 216–17 (5th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

■ The real issue in this case, as we see it, concerns the contract between Equity and FNMA and the legal consequences flowing therefrom. Equity was desirous of entering into a contract with FNMA allowing it to sell and service FNMA mortgages, and Equity persisted after it had first been turned down for failing to meet FNMA's standards. However, Equity eventually met all requirements and entered into written selling and servicing contracts with FNMA on September 9, 1976. Later, on April 18, 1977, Equity and FNMA entered into the Servicing Contract with which we are here concerned. Paragraph 1 of that

---

3. The fee sought by FNMA was computed on the basis of .15% of the FNMA mortgage portfolio serviced by Equity at the time of the sale.

contract incorporated therein, *inter alia,* a so-called "Servicing Contract Supplement," as such supplement existed at the time the basic Servicing Contract was signed, and as such supplement might "be amended or supplemented from time to time by FNMA." [4] Clearly then, at the time Equity signed the basic Servicing Contract, Equity knew that the signed agreement between the parties incorporated by reference an independent document, i.e., a supplement. Furthermore, Equity knew that said supplement might be subsequently amended by FNMA, and that it, Equity, would be bound by such amendments. That Equity would enter into a contract with FNMA which the latter could change by unilateral action (i.e., amending a supplement incorporated by reference into the contract) is perhaps surprising, but it did so for no doubt good and sufficient reason. In any event, under paragraph 1 of the Servicing Contract, Equity accepted the risk that FNMA might, at a later date, amend the Servicing Contract Supplement in a manner that would be detrimental to Equity.

Paragraph 7 of the Servicing Contract provides that the "contract shall be construed as being in the nature of a personal service agreement and accordingly may not be assigned by Servicer under any circumstances." Under paragraph 8 of that Contract, the servicer, i.e. Equity, could not assign its responsibility for servicing conventional mortgages except as permitted by FNMA, "as provided in the Servicing Supplement." And Section 105 of the Servicing Contract Supplement and paragraph 8 of the Servicing Contract provide that transfers of servicing by a servicer must be with the prior written consent of FNMA. Accordingly, under paragraphs 7 and 8 of the Servicing Contract, and Section 105 of the Servicing Contract Supplement, Equity agreed that any transfer of interest, or assignment of responsibility, in or under the Servicing Contract, had to be with FNMA's prior written consent.

In this setting, FNMA, in 1981, exercised its right to amend the Servicing Supplement by providing for a transfer fee on the transfer or assignment by a servicer of its interest under a servicing contract.[5] Equity was advised of this amendment long prior to the date of its transfer to Mager. Indeed, Equity by its letter of August 9, 1982, wherein it asked for FNMA's consent to the proposed sale to Mager, specifically recognized that there might well be a transfer fee involved. The present dispute really arose over the *amount* of the fee demanded by FNMA, not the *fact* that there was a fee.

Clear and unambiguous contracts should be enforced as written. *Premier Resources Ltd. v. Northern Natural Gas Co.,* 616 F.2d 1171, 1180 (10th Cir.) ("Under Oklahoma law, the language of the contract governs."), *cert. denied,* 449 U.S. 827, 101 S.Ct. 92, 66 L.Ed.2d 31 (1980). It is not the province of the courts to correct alleged inequities. *See Houston Oilers, Inc. v. Neely,* 361 F.2d 36, 42 (10th Cir.), *cert. denied,* 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966). Based, then, on the foregoing analysis of the agreement be-

**4.** Apparently, as of the date the 1977 Servicing Contract was executed, there was no Servicing Contract Supplement in existence. In any event, at the same time the 1977 Servicing Contract was signed, Equity, by written addendum, agreed that until such time as the Servicing Contract Supplement was issued by FNMA, the Servicing Contract Supplement "shall be construed to mean 'FNMA Servicer's Guide.'" A Servicing Contract Supplement was later issued by FNMA, and Section 105 thereof provided, in part, that a servicer could not transfer its responsibility for servicing any mortgage it had contracted to service for FNMA without FNMA's written consent. Section 105 also provided that a servicer could transfer its responsibility for servicing conventional mortgages *only* under the terms determined by FNMA and *only* with FNMA's prior written approval.

**5.** The Servicing Contract and the Servicing Contract Supplement use such phrases as "assignment of contract," "assign its responsibility for servicing," and "transfer its responsibility for servicing." The use of different terminology is apparently of no real significance here, since, in any event, the prior written consent of FNMA to any sort of transfer was required. Further, in its letter to FNMA seeking its consent to Equity's sale to Mager, Equity stated that it had "entered into an agreement, subject to your approval, to sell, assign and transfer all of our servicing[,] including your account[,] to Mager Mortgage Company ("Mager")."

tween the parties, we agree with the trial court that FNMA, in exchange for its consent to a transfer of interest, had the right to impose a transfer fee on Equity's sale of its interest under its servicing contract with FNMA to Mager. Equity's suggestion that the amount of such a fee should be limited to the actual, out-of-pocket expense incurred by FNMA in connection with the sale is without merit. Under the agreement, there could be *no* transfer of any sort by Equity *without* the prior written consent of FNMA. Equity and FNMA bargained for that consent, and we are not inclined to disturb their bargain.[6]

Judgment affirmed.

---

**6.** Even if the Servicing Contract and the Servicing Supplement made no mention of "consent" by FNMA to any transfer by Equity of its interest, it would appear that under paragraph 1 of the Servicing Contract, which incorporates by reference a Servicing Supplement which FNMA reserved the right to amend and supplement, a transfer fee could be imposed by FNMA by supplementing the Servicing Supplement. Further, even without the "incorporation by reference" provision in paragraph 1 of the Servicing Contract, the repeated presence of the "consent" requirement in the Servicing Contract and the Servicing Supplement reserved a right to FNMA which may be bargained for by the parties. The presence of *both* the "incorporation by reference" provision in paragraph 1 of the Servicing Contract and repeated references in the Servicing Contract and the Servicing Supplement to "consent" by FNMA to any transfer by Equity of its interest, fortifies the result reached by the trial court, and us.