PAY PHONE CONCEPTS,
INC., Plaintiff,

v.

MCI TELECOMMUNICATIONS
CORP., Defendant.

No. 95–4113–SAC.

United States District Court,
D. Kansas.

Sept. 6, 1995.

David P. Troup, Weary, Davis, Henry, Struebing & Troup, Junction City, KS, for plaintiff Pay Phone Concepts, Inc.

John H. Stauffer, Jr., Goodell, Stratton, Edmonds & Palmer, Topeka, KS, John C. Meinrath, MCI Telecommunications Corporation, Richardson, TX, for defendant MCI Telecommunications Corporation.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion to dismiss or, in the alternative, motion for summary judgment (Dk. 11) and the plaintiff's memorandum in support of declaratory judgment (Dk. 13). The plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the existing billing dispute between the parties is not subject to mandatory arbitration. The parties agree the court should decide the case on the facts as stipulated and on the legal issues as presented by their memoranda and motion. The court will consider all memoranda that have been filed, including the defendant's response (Dk. 16) and the plaintiff's response [1] (Dk. 17).

**FACTS**

The parties stipulate that the following facts are true for purposes of determining whether the billing dispute between the parties is subject to mandatory arbitration.

1. Plaintiff, Pay Phone Concepts, Inc. ("Pay Phone"), is a Kansas corporation and defendant, MCI Telecommunications Corporation "MCI") is a Delaware corporation and thus the parties are citizens of different states for purposes of 28 U.S.C. § 1332.

2. The amount in controversy exceeds $50,000.

3. MCI is a provider of long distance telecommunications services to individual and corporate users.

4. Pay Phone owns and operates pay telephones in the state of Kansas and was a purchaser of long distance services from MCI beginning in 1991.

5. During this period, MCI provided telecommunications services to Pay Phone pursuant to MCI Tariff F.C.C. No. 1 ("Tariff"), which is filed with the Federal Communications Commission ("FCC") in Washington, D.C.

6. In May or June 1993, Pay Phone executed a MCI Vision Promotion Enrollment Form and Agreement and a MCI Off-Peak Vision Enrollment Form and Agreement under which it agreed to use MCI services for a term of two years at an annual revenue of $60,000.00. The start date was June 15, 1993. A true and correct copy of the executed Agreements, totalling four preprinted pages, is attached to this Stipulation as Exhibit A and is incorporated by reference herein. Pay Phone executed no other document concerning service by MCI.

7. A true and correct copy of Tariff Section B–7.13, as in effect on May 1, 1993, is attached as Exhibit "B" and incorporated by reference herein.

8. The Tariff was amended in February 1994 to provide for binding arbitration of all disputes concerning or affecting payment of invoices totaling $10,000 and above on services rendered after February 28, 1994. The Tariff was amended in December 1994 to provide for binding arbitration of all disputes concerning or affecting payment of invoices issued after February 28, 1994, for charges totalling $10,000 and above. A true and correct copy of Tariff Section B–7.13 as in effect from February 4, 1994 to the present is attached marked Exhibit "C" and incorporated by reference herein. These tariff amendments were filed with the FCC in Washington, D.C. according to standard procedures.

9. No MCI representative personally informed Pay Phone of the amendments to the Tariff providing for binding arbitration, and Pay Phone was unaware of the amendments.

---

1. The plaintiff's response requests the court either to strike the defendant's response as unauthorized or to consider also the plaintiff's response. Though the court did not ask the parties to file response briefs, it will consider the briefs since they have been filed.

10. On May 12, 1995, MCI filed a Notice of Claim, Arbitration Case No. 1994ARB00099 with J.A.M.S./Endispute seeking an award of $97,957.44. That sum represents invoices issued after February 28, 1994. Of that sum, $1,340.76 represents charges for telephone service and $96,616.68 represents under-utilization charges arising from Pay Phone's failure to meet its call volume commitment. A statement of account setting forth the charges, payments, and credits is attached as Exhibit D and incorporated by reference herein.

11. Pay Phone filed a response to the arbitration claim of MCI, denying the claim on the merits but also objecting to the jurisdiction of the arbitration firm on the grounds that Plaintiff had never consented to arbitrate any disputes between the parties. Pay Phone plans to file an amendment to its arbitration response to further object to jurisdiction based upon its position that the invoices do not include charges for services rendered in excess of $10,000.00.

(Dk. 9). These stipulations and the referenced documents constitute the entire evidentiary record in this case.

The two agreements referenced above require MCI to provide special rates and discounts on long distance service based on the call volume and service term to which Pay Phone committed itself. Pay Phone committed to retain MCI service for two years, beginning June 15, 1993, and to use an annual minimum of $60,000 in services. In the event that Pay Phone's use did not meet the annual minimum commitment, the agreement provided that Pay Phone would still be charged for the difference between actual usage charges and its annual minimum commitment. For ease of reference, these charges will be called "under-utilization charges."

Both agreements have sections entitled **"Tariff Considerations"** which are substantially identical. As it appears in the second agreement, this section on tariff concerns reads:

This Enrollment Form and Agreement incorporates by reference the terms and conditions of MCI Tariff F.C.C. No. 1 ("MCI Tariff"). In the event of any inconsistency between this Enrollment Form and Agreement and the terms and conditions set forth in the MCI Tariff, as it may be amended from time to time, the MCI Tariff shall be deemed controlling.

Both agreements also have integration clauses which provide: "Together with the Tariff this is the complete agreement of the parties and supersedes any prior or contemporaneous proposals, discussions or agreements, written or oral, concerning...."

At the time that Pay Phone entered into these agreements, MCI's Tariff at § B–7.13 required arbitration of all disputes concerning or affecting invoices totaling more than $500 between MCI and its California customers. MCI's Tariff, however, did not require arbitration for disputes between it and its other customers.

In February of 1994, MCI amended Tariff § B–7.13, so as to read:

All disputes concerning or affecting payment of invoices totaling $10,000 and above, for services rendered after February 28, 1994, may be resolved through binding arbitration. A dispute concerns or affects payment of invoices when the customer fails to pay an invoice or contests it for any reason associated with the ordering, installation, provisioning, maintenance, repair, interruption, restoration or termination of any service or facility offered under this Tariff. Once MCI or the customer has commenced arbitration of a dispute, arbitration shall be mandatory, and counterclaims may be asserted.

Effective December 23, 1994, MCI revised the first sentence to provide: "All disputes concerning or affecting payment of invoices issued after February 28, 1994 for charges totaling $10,000.00 and above may be resolved through binding arbitration." The symbol "T" next to this amended sentence is intended "to signify a change in text but no change in rate or regulation." 47 C.F.R. § 61.54(i)(1) (1994).

Pay Phone did not meet its annual usage commitment for either year of the two-year contract. MCI billed Pay Phone for these

under-utilization charges through invoices beginning in June of 1994 through February of 1995. From June of 1994 through November of 1994, MCI billed Pay Phone for $38,-388.51,[2] and from December 25, 1994 through February of 1995, it billed Pay Phone for $59,705.98.

## ISSUES

(1) Does Pay Phone challenge the lawfulness of MCI's Tariff provision requiring arbitration, and, if so, does the court have jurisdiction to hear this challenge?

(2) Must Pay Phone arbitrate as required by MCI's Tariff regardless of its agreement with MCI?

(3) Have Pay Phone and MCI agreed to arbitrate their disputes as provided in MCI's Tariff provisions?

## LAWFULNESS OF TARIFF

Citing and summarizing the involved statutory scheme under which the Federal Communications Commission ("FCC") regulates it, MCI argues the district court is without jurisdiction to review the reasonableness or lawfulness of a tariff regulation. Pay Phone concedes this court is without jurisdiction to decide the reasonableness or fairness of MCI's Tariff. Pay Phone, however, denies that its declaratory judgment action exceeds the court's jurisdiction, for it does not contest the Tariff. Rather, Pay Phone says its suit simply asks the court to construe the agreements in determining if the parties have agreed to submit their disputes to binding arbitration. MCI accepts the court deciding whether the Tariff requires arbitration here and whether the written agreements also require arbitration. Because the court intends to decide only those issues, the court considers MCI's jurisdictional challenge to be moot.

## FEDERAL COMMUNICATIONS ACT

The Federal Communications Act ("FCA"), 47 U.S.C. §§ 151–613, establishes a regulatory scheme that is as comprehensive as that imposed by the Interstate Commerce Act. *MCI Telecommunications Corp. v. Graham,* 7 F.3d 477, 479 (6th Cir.1993).[3] The express purpose of the FCA is to "regulat[e] interstate and foreign commerce in communication by wire and radio so as to make available ... to all the people of the United States a rapid, efficient ... communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Towards that end, the FCA provides that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b).

Codified at 47 U.S.C. § 203 is the filed rate doctrine. *Cincinnati Bell Telephone v. Allnet Communication Services,* 17 F.3d 921, 924 n. 4 (6th Cir.1994). "The classic statement of the 'filed rate doctrine,' " as quoted in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990), comes from *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915):

"Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."

**2.** MCI's account statement for Pay Phone shows the invoices were offset by credits totaling $137.05.

**3.** Noting the similarity in functions and needs between the FCA and the Interstate Commerce Act, courts have looked to the case law interpreting the latter Act as an aid in interpreting and applying the FCA. *See, e.g., MCI Telecommunications Corp. v. American Tel. & Tel. Co.,* —— U.S. ——, ———————, 114 S.Ct. 2223, 2230–32, 129 L.Ed.2d 182, 192–93 (1994); *MCI Telecommunications Corp. v. Graham,* 7 F.3d 477, 479–80 (6th Cir.1993).

Section 203 requires all common carriers of interstate and foreign telecommunications to file a schedule of their charges, as well as the classifications, practices, and regulations affecting such charges. This schedule is known as a tariff. *Richman Bros. Records v. U.S. Sprint*, 953 F.2d 1431, 1435 (3rd Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3056, 120 L.Ed.2d 921 (1992). A carrier can charge only the rates listed in the tariff. 47 U.S.C. § 203(c)(1). The charges, classifications, regulations or practices in the filed tariff may be changed only after notice is given to the Federal Communications Commission ("FCC") and the public in a form required by regulation. 47 U.S.C. § 203(b)(1).

 " '[F]ederal tariffs are the law, not mere contracts.' " *MCI Telecommunications Corp. v. Graham*, 7 F.3d at 479 (quoting *MCI Telecommunications Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir.1992)). Valid tariffs filed with the FCC "conclusively and exclusively control the rights and liabilities between a carrier and its customer." *Graham*, 7 F.3d at 479; *see also Cincinnati Bell Telephone*, 17 F.3d at 923 n. 4; *MCI Telecommunications Corp. v. Graphnet, Inc.*, 881 F.Supp. 126, 132 (D.N.J. 1995). This includes any limitation of liability imposed by the tariff. *See Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571–72, 41 S.Ct. 584, 586–87, 65 L.Ed. 1094 (1921) ("The limitation of liability was an inherent part of the rate."). It matters not whether the customer assents, for the filed tariff controls the obligations and rights between the carrier and customer. *Id.* at 572, 41 S.Ct. at 586. Since it presumes that customers know what the applicable tariff is, the filed rate doctrine prevents an aggrieved customer from enforcing contract rights that contravene governing tariff provisions, *Graphnet, Inc.*, 881 F.Supp. at 132–33, or from asserting estoppel against the carrier, *Marco Supply Co. v. AT & T Communications*, 875 F.2d 434, 436 (4th Cir.1989).

 The FCA contemplates a carrier will amend its tariff. *See* 47 U.S.C. § 203(b). That such amendments could occur during the course of a carrier's relationship with one or more customers and that they could affect the terms of those contractual relationships are also anticipated happenings. "If the shipper sees fit to make a contract covering a definite period, for a rate in force at the time, he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law." *Armour Packing Co. v. United States*, 209 U.S. 56, 82, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908) (quoted in *American Broadcasting Companies, Inc. v. F.C.C.*, 207 U.S.App. D.C. 68, 643 F.2d 818, 825–26 (1980)). If the filed rate doctrine is to prevent unreasonableness and discrimination in charges, it follows that tariff amendments must supersede a carrier's prior contractual arrangements with customers.[4] A contracting customer is not without protection, for it receives notice of the tariff amendment in the manner prescribed by regulation, it can challenge the reasonableness of the amendment before the FCC, and it can change carriers. *See Tariff Filing Requirements for Nondominant Common Carriers*, 8 F.C.C.R. 6752, ¶ 25 (1993), *vacated on other grounds, Southwestern Bell Corp. v. F.C.C.*, 43 F.3d 1515, 1526 (D.C.Cir.1995).

 Pay Phone's arguments simply do not defeat the binding legal effect of MCI's Tariff. It exclusively controls the rights and liabilities between MCI and Pay Phone. By having enrolled to receive service pursuant to MCI's Tariff, Pay Phone is presumed to know the terms of the Tariff and that MCI may amend its Tariff from time to time. Accordingly, for purposes of this dispute and this court's limited jurisdiction, section B–7.13 of the Tariff requiring arbitration is binding upon Pay Phone regardless of whether it agreed to arbitration or not.

---

4. In a recent decision, the FCC noted: "As a matter of law, under the filed rate doctrine, such contractual arrangements between carriers and users could always have been superseded by a subsequent tariff filing." *Tariff Filing Requirements for Nondominant Common Carriers*, 8 F.C.C.R. 6752, ¶ 26 (1993), *vacated on other grounds, Southwestern Bell Corp. v. F.C.C.*, 43 F.3d 1515, 1526 (D.C.Cir.1995).

## FEDERAL ARBITRATION ACT [5]

 The Federal Arbitration Act ("FAA") was intended "to reverse the long-standing judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). The basic purpose of the Act is to give arbitration provisions "the same footing" as other contractual terms. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974). Part of its motive for passing the FAA may have been to facilitate expeditious and inexpensive dispute resolution, Congress, however, "'was motivated, first and foremost, by a ... desire to enforce agreements into which parties had entered.'" *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989) (quoting *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)). Accordingly, the FAA does not compel arbitration unless the parties have agreed to arbitrate, and it does not bar agreements to arbitrate only certain disputes. *Id.*

 The principal substantive provision of the FAA is section two, which reads in relevant part:

A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ..., shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. In short, this section provides for the enforcement of written arbitration provisions in "a contract evidencing a transaction involving commerce." *Allied–Bruce Terminix Companies, Inc. v. Dobson,* —— U.S. ——, ——, 115 S.Ct. 834, 836–837, 130 L.Ed.2d 753, 760 (1995). "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

 The FAA "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." [6] *Id.* Arbitration is a matter of contract; [7] thus, the duty to arbitrate often depends on contract interpretation.[8] *Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163, 1165 (8th Cir. 1984). In construing an arbitration provision, as with any other contract term, "the parties' intentions control." [9] *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). The federal policy favoring arbitration tempers the rules of contract interpretation by having the parties' "intentions ... generously construed as to issues of arbitrability," *id.,* by resolving am-

---

5. By reason of its earlier conclusion, the court could dispense with addressing this issue. Nonetheless, the court will discuss the issue briefly for the benefit of the parties.

6. This is not to say that state law has no role. Indeed, the courts may look to it is a source for developing the federal common law unless a uniform federal rule is necessary or the state and federal policies are at odds. *McCarthy v. Azure,* 22 F.3d 351, 356 (1st Cir.1994).

7. "'[N]o party can be forced to arbitrate unless that party has entered an agreement to do so.'" *McCarthy v. Azure,* 22 F.3d 351, 359 (1st Cir. 1994) (quoting *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 511 (3rd Cir.1990)).

8. It is for the court, not the arbitrator, to decide whether the parties agreed to arbitration and what issues must be arbitrated. *AT & T Technologies v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *see Oil, Chemical & Atomic Workers Intern. Union v. American Oil Co.,* 528 F.2d 252, 254 (10th Cir.1976) ("The issue of arbitrability is for judicial determination because no party has to arbitrate a dispute unless it has consented thereto." (citations omitted)).

9. General principles of contract law recognize the court is to discern the parties' intentions as revealed in the contract itself. *McCarthy v. Azure,* 22 F.3d at 355.

biguities in favor of arbitration, *Volt Information Sciences*, 489 U.S. at 475–76, 109 S.Ct. at 1253–54, and also by resolving any doubt concerning arbitrability in favor of arbitration, *McKee v. Home Buyers Warranty Corp. II*, 45 F.3d 981, 985 (5th Cir.1995).

 When Pay Phone signed the agreements with MCI, Pay Phone knew that the agreements plainly and unambiguously incorporated by reference MCI's Tariff. It also knew that the Tariff required arbitration of MCI's customers in California. Moreover, Pay Phone knew that MCI might subsequently amend the Tariff and that Pay Phone would be bound by any subsequent amendments. Pay Phone "accepted the risk that ... [MCI] might, at a later date, amend the ... [Tariff] in a manner that would be detrimental to ... [Pay Phone]." *Armstrong v. Federal Nat. Mortg. Ass'n*, 796 F.2d 366, 371 (10th Cir.1986). The court finds that the agreements in a reasonably clear and ascertainable manner incorporate MCI's Tariff and subsequent amendments to it.

 Arbitration agreements can be incorporated by reference. *See, e.g., Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership*, 41 F.3d 861, 864 (2nd Cir.1994); *Commercial Union Ins. Co. v. Gilbane Bldg. Co.*, 992 F.2d 386, 388–89 (1st Cir.1993); *Cianbro Corp. v. Empresa Nacional de Ingenieria*, 697 F.Supp. 15, 17 (D.Me.1988); *Johnson v. Piper Jaffray, Inc.*, 530 N.W.2d 790, 796 (Minn.1995); *Rashid v. Schenck Const. Co., Inc.*, 190 W.Va. 363, 367, 438 S.E.2d 543, 547 (1993). General contract law recognizes that "'incorporation by reference is generally effective to accomplish its intended purpose.'" *Transamerica Premier Ins. v. Collins & Co.*, 735 F.Supp. 1050, 1051 (N.D.Ga.1990) (quoting *Binswanger Glass Co. v. Beers Construction Co.*, 141 Ga.App. 715, 717, 234 S.E.2d 363, 365 (1977)). There are no compelling circumstances that would justify deviating from these general rules of contract law. If anything, the strong federal policy in favor of arbitration adds to the reasons for enforcing the agreements as written. The dispute between MCI and Pay Phone comes within the terms of § B–7.13 for the dispute concerns Pay Phone's payment of invoices that MCI issued after February 28, 1994. Accordingly, the court finds that Pay Phone is obligated also by its agreements with MCI to arbitrate the dispute at issue.

IT IS THEREFORE ORDERED that by the terms of the MCI Tariff and the agreements between the parties, Pay Phone is obligated to arbitrate the dispute concerning its payments of the invoices that MCI issued after February 28, 1994;

IT IS FURTHER ORDERED that the defendant's motion to dismiss is denied, but its alternative motion for summary judgment (Dk. 11) is granted;

IT IS FURTHER ORDERED that the clerk of the court is directed to enter judgment and costs in favor of the defendant.