FAX TELECOMMUNICACIONES, Plaintiff,

v.

AT & T, Defendant.

No. 94–CV–5339 (JS).

United States District Court, E.D. New York.

Dec. 30, 1996.

Charles Wallshein, Freeport, NY; Stacey Van Malden, New York City, for Plaintiff.

Elizabeth Sacksteder, Sidley & Austin, New York City, for Defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

Plaintiff Fax Telecommunicaciones ("Fax") originally brought this action in state court against defendant AT & T, alleging that AT & T overbilled it in connection with certain overseas and domestic long-distance telephone services provided by AT & T. Defendant AT & T then removed the action to federal court, claiming federal question jurisdiction under the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* AT & T now moves for summary judgment dismissing Fax's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure and in favor of AT & T's counterclaim for the balance due on Fax's account of $2,321,390.71. The Court heard oral argument on the summary judgment motion on June 7, 1996 and reserved decision. As set forth below, the Court now decides this motion and hereby grants in part and denies in part AT & T's motion for summary judgment.

## FACTUAL BACKGROUND

Fax is a New York corporation that operates telephone arcades in Brooklyn and Queens, New York. The arcades, which provide long distance service, are open to the public. Fax's customers pay a deposit, make their call, and then are billed a certain rate based on the country they call and the length of the phone call. Ospino Aff. ¶ 2. Approximately 80 to 85% of Fax's calls go to Colombia, the rest are directed to other Latin American countries. *Id.* ¶ 3.

In August, 1993, Fax's president David Ospino met with representatives from AT & T to analyze Fax's calling needs and to negotiate a service plan from AT & T. Ospino Aff. ¶ 3, Stotts Aff. ¶ 4. On December 21, 1993, Richard Stotts, an AT & T representative, presented a plan to Ospino for service under AT & T's "Uniplan Conquest" tariff. Ospino Aff. ¶ 4, Stotts Aff. ¶ 8. At the time, according to Ospino, AT & T promised to amend the existing "Conquest" tariff to allow for volume discounts for dedicated service in

a way that would more accurately fit Fax's needs.[1] Ospino Aff. ¶ 4.

At the December 21, 1993 meeting, Stotts also presented Ospino with a "Network Services Commitment Form" giving Fax the three year "Uniplan Conquest" offer. Stotts Aff. ¶ 8. Ospino signed the offering form with the understanding that Fax's bills would be re-rated retroactively upon the filing of the amendment to the Conquest tariff allowing the desired discounts for dedicated service.[2] Stotts Aff. ¶ 8. In the interim, AT & T would provide Fax with service under the "CustomNet" tariff, which bills at a much higher rate than the Conquest tariff. Stotts Aff. ¶ 8. Fax, however, never signed a contract for the CustomNet service. *Id.*

On or about January 8, 1994, Fax began using AT & T as its long-distance carrier. Ospino Aff. ¶ 5. On approximately January 14, 1994, Ospino met with Stotts again, at which time Stotts gave Ospino an unsigned letter, an "Authority to Quote" or "ATQ," that purported to describe the service that AT & T would provide to Fax.[3] Ospino Aff. ¶ 5. In connection with the services that Fax intended to receive from AT & T, Fax also made a $3,500 deposit and ordered certain digital pipe for a "T1 System" to provide direct dedicated service from AT & T. Ospino Aff. ¶ 5, Stotts Aff. ¶ 17. Stotts also informed Ospino that the draft ATQ would soon be completed and filed with the Federal Communications Commission (the "FCC"). *Id.* ¶ 6.

Between January and March 1994, another AT & T representative, Fabio Herrera, directed eight other calling centers to Fax. Ospino Aff. ¶ 7. AT & T informed Fax that these smaller centers, which did not have the volume to qualify for AT & T's lowest rates, could obtain AT & T service through Fax and all be billed under one service umbrella. *Id.* In this way, the smaller centers could pool their calling volume with Fax to maximize volume discounts.

In February 1994, Fax received its first service bill from AT & T. To Ospino's surprise, the rates billed did not reflect the rates described in the January 14, 1994 ATQ. Ospino Aff. ¶ 8. Ospino contacted Stotts and Herrera about the invoice amount, and they informed Ospino that the next bill would reflect a credit to Fax. *Id.* Ospino then remitted approximately $75,000 to AT & T, based upon his calculations of what was due under the rates and discounts in the ATQ. *Id.* ¶ 9.

In March 1994, Fax received a second invoice. Again, the bill reflected higher rates than Fax was promised, and this time, included a past due amount of $120,000. Ospino Aff. ¶ 10. Ospino attempted to contact Stotts, but discovered that he had moved to another district. *Id.* ¶ 11. Ospino then contacted Herrera, who informed Ospino that Fax's tariff was still being processed at the FCC and assured him that the billing problems would be straightened out. *Id.* Ospino then remitted approximately $85,000 to AT & T, again based upon his calculations of what was due under the rates and discounts promised in the ATQ. *Id.* ¶ 12.

In March 1994, Michael Gilmartin, another AT & T representative, met with Ospino to discuss Fax's billing problems. Gilmartin Aff. ¶ 3, Ospino Aff. ¶ 13. During Gilmartin's visit with Ospino, Gilmartin assisted in preparing local advertisements for Fax's rate of $.57 per minute for calls to Columbia. Ospino Aff. ¶ 13. Gilmartin also informed Ospino that he would investigate the billing problems. Ospino Aff. ¶ 13.

In April 1994, however, Fax received another bill from AT & T that exceeded the rates promised under the ATQ. Fax remitted $90,000, again in accordance with Ospino's calculations of the amount that should be

---

1. Dedicated service is direct access to AT & T service without having to by-pass or switch from a local carrier. Dedicated service is less expensive than switched service, which carries accompanying switching fees. Mandeen Aff. ¶ 7.

2. AT & T routinely achieved such re-rating by applying credits and bonuses to customer's bills because they could not literally re-rate tariffs

without violating FCC regulations. Stotts Aff. ¶ 10, 11.

3. The ATQ contained a typographical error in that the letter referred to the "First 30 Minutes" and "Add'l 6 Minutes," whereas it should have referred to the time in seconds rather than minutes. Mandeen Aff. ¶ 6.

due under the ATQ. Ospino Aff. ¶ 14. Because of the continuing past due account with AT & T, Ospino also contacted AT & T's billing department to seek assurances that Fax's service would not be disconnected. *Id.* The same events transpired in May 1994. *Id.* ¶ 15.

Finally, in June 1994, Gilmartin informed Ospino that AT & T would not be able to charge the rates promised in the ATQ and presented a different tariff for Ospino to accept. Ospino Aff. ¶ 16. By letter dated June 23, 1994, AT & T offered a new ATQ and a proposal for service to switched locations such as Fax.[4] Mandeen Aff. ¶ 9. Ospino refused, and Gilmartin informed him that AT & T planned to disconnect Fax's service. Ospino Aff. ¶ 16. As of June 1994, Fax stopped making payments to AT & T altogether. *Id.* ¶ 18. In September 1994, AT & T offered Fax a $750,000 credit towards its outstanding account balance of $2.5 million. *Id.* ¶ 19. The bill, however, still amounted to three times the amount actually collected from Fax's customers. *Id.* Finally, in October 1994, AT & T terminated Fax's service.

Subsequently, Fax obtained long distance telephone service from Saetel, another secondary carrier. Ospino Aff. ¶ 24. Saetel in turn purchased its long distance service from AT & T. *Id.* ¶ 23. Fax received long distance service from Saetel from October 1994 to July 1995, when Saetel went out of business. *Id.* ¶ 25.

Fax was to be the first user to contract for the amended Conquest tariff proposed in December 1993. Stotts Aff. ¶ 14. AT & T's tariff had already been amended thousands of times. *Id.* ¶ 16. Once a tariff amendment is written, the customer must enter into the contract for the tariff to become effective. *Id.* ¶ 14. The carrier must then file the tariff amendment with the FCC, together with a letter stating that the contract tariff was necessary due to competitive necessity. *Id.* ¶ 14. AT & T, however, never filed the Uniplan Conquest rate, and Fax was left on the much more expensive CustomNet tariff

through the termination of its service in October 1994. *Id.* ¶ 16. From January 1994 to October 1994, therefore, Fax used and was billed pursuant to AT & T's CustomNet tariff under AT & T Tariff F.C.C. No. 1. Lowenberg Aff. ¶ 5–7.

The parties dispute several factual issues. According to AT & T, Fax never contracted for the Conquest service. AT & T supports this contention by demonstrating that the rates described in the January 14, 1994 ATQ were merely drafts and furthermore would be impossible to deliver. First, there was a typographical error referring to rates per minute rather than per second. Second, rates were rounded off to the second decimal point rather than the fourth decimal point. Third, the Conquest promotion had a $3,500 per month cap on available discounts. Finally, the ATQ referred to re-rating, which is not possible under the terms of the Conquest tariff. Mandeen Aff. ¶ 10.

Fax, on the other hand, disputes the impossibility of charging the rates in the ATQ, notwithstanding the typographical error. First, Fax claims that AT & T charged Saetel a lower rate than the rate charged to Fax for similar services. Fax asserts that AT & T filed a tariff with the FCC for the service plan it provided to Saetel, which AT & T then could have provided to Fax, which would qualify for even greater discounts based on Fax's volume and calling patterns. Pltf's Mem. in Opp., at 8. Second, Fax asserts that the rates promised in the January 14, 1994 ATQ were not impossible to provide if all discounts and bonuses were considered in applying the rate. Stotts Aff. ¶ 23.

Fax seeks the following relief: (1) declaratory judgment that the January 14, 1994 ATQ is a binding agreement between Fax and AT & T; (2) specific performance of the ATQ; (3) declaratory judgment that AT & T contracted to install the T1 pipe. In the alternative, Fax seeks monetary and punitive damages from AT & T for failure to perform such contracts.

---

4. Although Fax made a $3,500 deposit for the required digital pipe necessary to obtain the less expensive dedicated service, the installation was delayed during the pendency of the Conquest tariff amendment filing. Stotts Aff. ¶ 17. AT & T never put the T1 order through because it would have locked Fax into the Conquest rate prior to amendment to include volume discounts. *Id.*

## DISCUSSION

### I. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

■ Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the law of the Second Circuit, a district court must weigh several considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim. *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994) (internal case citations omitted). First, the moving party carries the burden to demonstrate that no genuine issue respecting any material fact exists. *Id.* (citations omitted). Second, all ambiguities and inferences must be resolved in favor of the non-moving party. *Id.* Third, the moving party may obtain summary judgment by showing that no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight. *Id.* Finally, the trial court's duty is confined to issue-finding and does not extend to issue-resolution. *Id.*

In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. THE FILED RATE DOCTRINE

#### A. *General Background*

■ Under the Federal Communications Act of 1934, 47 U.S.C. § 203 (the "FCA"), telecommunications service providers are required to file with the FCC a listing of the terms and conditions under which they will provide services to their customers. This listing, called a tariff, also sets out the charges, classifications, practices and regula-

tions for that particular tariff. *MCI Telecommunications v. Best Telephone Co.,* 898 F.Supp. 868, 872 (S.D.Fla.1994). Once filed, the tariff exclusively controls the rights and liabilities of the parties as a matter of law. *Id.* (citation omitted).

■ Because the tariff is filed, customers are presumed to have constructive knowledge of the rates governing their telecommunications service. *Marcus v. AT & T Corp.,* 938 F.Supp. 1158, 1169 (S.D.N.Y.1996) (citing *Kansas City S.R. Co. v. Carl,* 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913)). As a result, any privately negotiated rates that depart from the filed rate are superseded. 47 U.S.C. § 203(c); *Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 52 L.Ed. 681 (1908). This doctrine, known as the "filed rate doctrine," bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable. *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir.1994). Thus, the filed rate doctrine prevents an aggrieved customer from enforcing contract rights that contravene governing tariff provisions or from asserting estoppel against the carrier. *Pay Phone Concepts, Inc. v. MCI Telecommunications Corp.,* 904 F.Supp. 1202, 1207 (D.Kan.1995).

■ The filed rate doctrine has a two-fold purpose. First, the Supreme Court has long-held that the reasonableness of rates in a regulated industry is a question solely for the governing regulatory body. *See Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Second, the doctrine prevents utilities from discriminating in the prices they charge for the same service among different ratepayers. *Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Thus, non-justiciability and anti-discrimination are the core purposes of the doctrine.

Application of the filed rate doctrine often has seemingly harsh and unfair results. *MCI Telecommunications Corp. v. TCI Mail, Inc.,* 772 F.Supp. 64, 67 (D.R.I.1991). For example, in *Marco Supply Co. v. AT & T,* 875 F.2d 434 (4th Cir.1989), plaintiff Mar-

co Supply contracted with AT & T to install a computer-telephone network at agreed upon rates quoted by AT & T. When the invoices reflected much higher rates than the quoted amount under the contract, Marco brought suit, claiming negligent and willful misrepresentation and breach of contract. Finding that the filed rate doctrine applies under the Federal Communications Act, the Fourth Circuit upheld the dismissal of Marco's complaint. *Id.* at 436. Specifically, the court noted that while Marco "may have equity on its side, the law is against it." *Id.* According to the court, a regulated carrier *must* charge the tariff rate established with the appropriate regulatory agency, even if it has quoted a lower rate to its customer. *Id.* (citing *Louisville & Nashville Railroad v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915)).

 The filed rate doctrine therefore bars claims for breach of contracts relating to privately negotiated lower rates. This harsh rule applies even when the conduct of the telecommunications carrier is fraudulent. As the Second Circuit has held, there is no fraud exception to the filed rate doctrine. *See Wegoland,* 27 F.3d at 22. Under such circumstances, the courts leave enforcement to the regulators, who are best situated both to discover when regulated entities engage in fraud and to remedy the wrongdoing when the specter of fraud arises. *Id.* at 21. By declining to adjudicate claims of fraud or breach of contract for lower, negotiated rates, courts are able to accommodate the goal of non-justiciability inherent in the filed rate doctrine. To do otherwise would force the courts to determine what the reasonable rate would be in order to assess damages. *Id.*

To avoid the harsh consequences of the filed doctrine, however, Fax has asserted two arguments that purport to create exceptions to the rule. First, Fax argues that because FCC policy now allows AT & T to enter into privately negotiated "contract tariffs," the Court should enforce those contracts. Second, Fax contends that notwithstanding the enforceability of the contract tariff, AT & T's conduct falls within an exception to the limitation of liability under the filed tariff for

cases of "willful misconduct." The Court will address each of these arguments in turn.

### B. *The Enforceability of Contract Tariffs*

 There are two ways that a carrier can alter the terms of a filed tariff. First, the FCA contemplates that a carrier may amend its tariff from time to time. 47 U.S.C. § 203(b). Tariff amendments then supersede a carrier's prior contractual arrangements with customers. *Pay Phone Concepts,* 904 F.Supp. at 1207. Second, carriers and customers can enter into contracts to file tariffs according to the customer's individual needs. Once such "contract-based tariffs" are filed, they are presumptively lawful. *See infra.*

Fax argues that at the time it negotiated with AT & T for long distance service, the parties entered into a contract for Conquest Uniplan Service. Ospino Aff. ¶ 4. To meet Fax's need for volume discounts, AT & T also promised to amend the existing Conquest tariff, which at that time did not provide for such discounts on dedicated service. Fax asserts that AT & T then had a duty to file this contract-based tariff under FCC guidelines, at which time Fax's service would be switched from the expensive CustomNet rates to the individually negotiated and amended Conquest rate. The filed Conquest tariff would then govern the billing under Fax's account. Because of complications AT & T faced in obtaining profitable rates from Colombia, however, AT & T never filed the amended Conquest tariff as agreed.

Fax now argues that because the FCC allows such contract-based tariffs to be filed and become enforceable, it can go outside the filed rate doctrine for relief. AT & T, on the other hand, suggests that no liability can arise from AT & T's failure to file the promised rate.

Prior to 1991, AT & T's argument may have had more merit. Since 1991, however, the FCC has adopted rules and regulations specifically allowing AT & T to enter into so-called "contract tariffs" in keeping with the Federal Communications Act. *See generally In the Matter of Competition in the Interstate Interexchange Marketplace,* CC Docket No. 90–132, 6 F.C.C. Rec. 5880, 1991 WL

638354 (F.C.C.). The FCC bases its authority to allow such contract-based tariffs on § 203(a) of the FCA, which gives the FCC broad discretion to define the type and format of information that AT & T must file. *Id.* ¶ 127. The Court of Appeals for the District of Columbia has upheld the FCC's power to permit such tariffs. *See MCI Telecommunications Corp. v. FCC*, 917 F.2d 30, 37–38 (D.C.Cir.1990).

Allowing such contract tariffs is a direct result of the proliferation of telecommunications carriers that have been able to increase competition in the marketplace for telephone service, which AT & T once dominated. *See In the Matter of Competition*, at ¶ 8. To be able to effectively compete in the market for business telephone services, the FCC has allowed carriers to individually negotiate customer contracts, provided that the contract tariffs are generally available to other similarly situated customers. *Id.* ¶¶ 1, 8, 91.

The FCC further found that the anti-discrimination concerns that gave rise to the filed rate doctrine were not implicated by allowing contract-based tariffs. First, as noted above, the FCC requires AT & T to make its contracts generally available to similarly situated consumers so as to comply with the § 202(a) non-discrimination provisions of the FCA. *Id.* ¶ 112. Second, the FCC found that there is substantial competition throughout the outbound business services market, which extends from large business customers to small ones. *Id.* This competition helps ensure that all customers purchasing business services subject to streamlined review receive just, reasonable and nondiscriminatory rates, regardless of whether the purchase is made pursuant to generic or contract-based tariffs. *Id.*

Such tariffs must be filed fourteen days prior to the effective date of such contracts, and the FCC will presume that such tariffs are lawful. *Id.* ¶¶ 74, 91, 121. The tariff must contain the term of the contract, a brief description of each of the services provided, the minimum volume commitments for each service, the contract price for each service, a generic description of any volume discounts built into the contract rate structure and a general description of other classifications, practices, and regulations affecting the contract rate. *Id.* ¶ 121.

Despite this detailed mechanism for carriers such as AT & T to enter into privately negotiated contract tariffs with their customers, the FCC has yet to address how the customers are to enforce these contracts and whether any liability can arise from AT & T's failure to file such contract tariffs as promised. Under the FCC order, the FCC only retains the authority to institute at any time on its own motion investigations of AT & T tariffs *after* they become effective and to declare tariffs unlawful, if necessary. *Id.* The FCC, however, also has the authority to adjudicate complaints of unlawful actions by AT & T. *Id.* These provisions are ambiguous at best. The question of the Court's role in enforcing these contracts is left open.

AT & T takes the position that while it does have the power to file such contracts, under the filed rate doctrine, no liability can arise from Fax's reliance on a contract tariff that was never filed with the FCC. The matter is complicated by the fact that while Fax asserts that it contracted for the Conquest Uniplan tariff, it is undisputed that Fax received service and was billed under the CustomNet tariff.

Although there are no cases directly on point in regard to the enforceability of contract tariffs, the underlying principles of the filed rate doctrine enunciated in *Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), are instructive. *Maislin* involved a carrier, Maislin, that had undercharged a shipper, Primary, pursuant to a privately negotiated rate for the transport of certain goods. Primary's subsidiary Quinn Freight Lines transported the goods for Primary. Maislin's estate in bankruptcy then sued to recover the undercharges from Primary. Primary argued that since the parties had negotiated lower rates, rebilling at the higher, filed tariff would constitute an unreasonable practice in violation of the Interstate Commerce Act. *Id.* at 122–23, 110 S.Ct. at 2764. The case was referred to the Interstate Commerce Commission (the "ICC"), which ruled in Primary's favor. *Id.* The ICC found that Primary had negotiated rates

other than the filed rates and that Primary had relied on the carrier to file the rates with the ICC. *Id.* at 122–25, 110 S.Ct. at 2764–65. In addition, because Primary reasonably believed that the amounts billed were correct, and that such amounts were a result of negotiation between the parties, Maislin could not recover the undercharges. *Id.* at 124–25, 110 S.Ct. at 2765.

The Supreme Court, however, found that the ICC policy contravened the intent and language of the ICA. The Court found that by refusing to order collection of the filed rate solely because the parties had agreed to a lower rate, the ICC permitted price discrimination in violation of the express language of the ICA. *Id.* at 130, 110 S.Ct. at 2768. Moreover, the policy, by sanctioning adherence to unfiled rates, undermined the basic structure of the Act requiring that all rates be filed. *Id.* at 131–33, 110 S.Ct. at 2769. Thus, the ICC's remedy of allowing privately negotiated unfiled rates to be enforceable nullified the requirements of non-discriminatory and stable rates as prescribed under the ICA. *Id.* at 131–33, 110 S.Ct. at 2769.

■ Like the ICA, compliance with the rate filing provisions of the FCA is "utterly central" to the administration of the FCA. *MCI Telecommunications v. American Telephone & Telegraph Co.*, 512 U.S. 218, 229–31, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994) (citing *Maislin,* 497 U.S. at 132, 110 S.Ct. at 2769). The core message from *Maislin* is that neither the courts nor the FCC can enforce unfiled rates, regardless of the equitable claims that may be raised against the carrier concerning the formulation of those rates. To allow otherwise would be to contradict both of the twin aims of the filed rate doctrine and the FCA itself. First, enforcing a contract rate that was never filed flies directly in the face of the anti-discrimination

arm of the FCA. Second, enforcing a contract rate would require the Court to engage in the rate-making process by determining which discounts were available and what would be reasonable charges under the purported contract. The Court is simply not so empowered. Thus, any dispute as to whether the contract itself was valid or whether the terms of the ATQ could actually be offered to Fax are not material to the determination of Fax's claims.

■ In light of the purposes of the FCA and the Supreme Court's decision in *Maislin,* therefore, the Court cannot enforce a contract for an unfiled tariff.

### B. *Willful Misconduct*

■ Fax attempts to avoid the harsh consequences of the filed rate doctrine by pointing to the liability provisions within the CustomNet tariff itself. AT & T Tariff F.C.C. NO. 1, § 2.3.1(a) limits AT & T's liability to its customers except in instances of willful misconduct. *AT & T v. New York City Human Resources Admin.,* 833 F.Supp. 962, 974 (S.D.N.Y.1993).[5] The tariff provides in Section 2.3.1 that:

> The Company's liability, if any, for its willful misconduct is not limited by this tariff. With respect to any other claim or suit, by a Customer or by any others, for damages associated with the installation, provision, termination, maintenance, repair or restoration of [long-distance service] ... the Company's liability, if any, shall not exceed an amount equal to the initial period charge provided for under this tariff.

Courts have found, therefore, that willful misconduct, if proven, discharges the limited liability under the tariff. *New York City HRA,* 833 F.Supp. at 974 (citing *MCI Telecommunications Corp. v. Management Solutions, Inc.,* 798 F.Supp. 50, 52 (D.Me.1992);

---

5. The Second Circuit has defined "willful misconduct" as:

> the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or it may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences ..., [or] the intentional omission of some act, with knowl-

edge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission.

*Berner v. British Commonwealth Pac. Airlines, Ltd.,* 346 F.2d 532, 536–37 (2d Cir.1965) (internal citations omitted), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966).

*MCI Telecommunications v. TCI Mail, Inc.,* 772 F.Supp. 64, 67 (D.R.I.1991)).

Fax claims that AT & T acted with willful misconduct by (1) inducing Fax to become an AT & T customer by contracting to file a tariff; (2) failing to file the tariff,; (3) failing to notify plaintiff that plaintiff's tariff order was never processed; and (4) giving Fax continued assurances that the order would be processed. Fax further claims that it is not challenging the reasonableness of the AT & T Tariff on file, and thus the concerns of the filed rate doctrine are not implicated. For example, the tariff itself provides for volume discounts. Second, the tariff has been amended thousands of times by AT & T to meet "competitive necessity." Stotts Affidavit, at ¶ 16.

AT & T argues, on the other hand, that this provision does not establish a separate cause of action for willful misconduct. Rather, its function is merely to modify the tariff's limitation of liability in certain narrow circumstances. According to AT & T, therefore, "willful misconduct" is a narrow exception to the general limitation of liability provided for in the tariff and applies solely to AT & T's business activities unrelated to the filing of a tariff or collecting the rates therein.

AT & T's argument, however, places the exception before the rule. First, although the Court agrees that the entire liability provisions of the tariff must be read as a whole, the more reasonable reading of the provision is that AT & T's liability for willful misconduct is limited only when a dispute relates to the installation, maintenance, provision or repair of service. In claims unrelated to these specific instances, AT & T is liable for willful misconduct.

Because of the requirements of the filed rate doctrine, however, claims of willful misconduct must be barred if they would require the Court to either enforce a discriminatory rate or to assess the reasonableness of a proposed rate. The cases cited by Fax that allowed allegations of willful misconduct to go forward did not implicate these central concerns of the FCA. *See Transportation Data Interchange v. AT & T Corp.,* 920 F.Supp. 86, 89 (D.Md.1996).[6]

For example, in *Cooperative Communications, Inc. v. AT & T Corp.,* 867 F.Supp. 1511 (D.Utah 1994), the court found that AT & T engaged in willful misconduct when plaintiff CCI, a long-distance reseller, complained that AT & T's representatives went to CCI's customers and disparaged CCI's business in hopes of diverting the customers to its own local services. The court specifically noted that CCI was "not seeking to enforce the misrepresentations" as to its rates. *Id.* at 1518. In *CCI,* therefore, the Court would not be required to either enforce an unfiled rate or estimate a reasonable rate in assessing damages.

Likewise, in *MCI Telecommunications Corp. v. Management Solutions,* 798 F.Supp. 50 (D.Me.1992), the court denied summary judgment made by MCI. In *Management Solutions,* the telephone service purchaser complained that MCI had failed to take action to correct certain overcharges in its bill that arose from unauthorized access to its telephone equipment. The court found that a genuine issue of material fact existed as to whether MCI's affirmative representations that it would correct the problem constituted willful misconduct.[7] *Id.* at 50. As in *CCI,*

---

**6.** The exception to this case law is *MCI Telecommunications Corp. v. TCI Mail, Inc.,* 772 F.Supp. 64 (D.R.I.1991), in which the court denied a motion to dismiss claims of tortious misrepresentation against MCI, and refused to follow the Fourth Circuit's decision in *Marco Supply Co. v. AT & T,* 875 F.2d 434 (4th Cir.1989). The analysis in *TCI Mail,* however, is precisely the type analysis that was rejected by the Supreme Court in *Maislin. See supra* p. 954. Moreover, in *TCI Mail,* the court found that lower rates could be enforced if they were not "unreasonable." 772 F.Supp. at 68. While this analysis may arguably avoid the anti-discrimination concerns of the

FCA, it does nothing to satisfy the requirement that courts not engage in the business of determining what rates are reasonable. That is a determination to be made solely by the FCC.

**7.** *Cf. AT & T v. New York City Human Resources Admin.,* 833 F.Supp. 962 (S.D.N.Y.1993). The defendant City agency attempted to discharge certain AT & T invoices by raising issues of fact as to whether AT & T's action with respect to the invoices constituted "willful misconduct" and precluded summary judgment. 833 F.Supp. at 974. The New York City Human Resources Administration ("HRA") claimed that AT & T failed

the plaintiff did not seek to obtain a different, lower rate, and thus the Court would not be involved in enforcing a discriminatory rate or assessing what rate should be charged.

Finally, in *Gelb v. AT & T Co.*, 813 F.Supp. 1022 (S.D.N.Y.1993), plaintiff asserted that AT & T deceitfully induced customers to use AT & T's calling card by offering a lower rate and then charging a higher one. Again, the plaintiff in *Gelb* did not challenge the reasonableness of the rates on file, rather, plaintiff only claimed fraud in advertising. *Id.* at 1026. The Southern District articulated a possible exception to the filed rate doctrine when there are circumstances of "universal fraud." *Id.* at 1030–1031. Because the fraud alleged under the circumstances in *Gelb* did not implicate either the anti-discrimination or the non-justiciability concerns of the filed rate doctrine, the court refused to dismiss the complaint. *Id.* at 1029. In particular, the court was persuaded by the fact that the suit was a class action, such that individually negotiated rates, from which discrimination concerns arise, were not involved. *Id.* Furthermore, because the class sought injunctive rather than compensatory relief, the court observed that it would not have to adjudicate a reasonable rate in order to assess damages. *See id.* at 1032–1033.

The only case that appears to suggest a different result is *Florida Municipal Power Agency v. Florida Power & Light Co.*, 64 F.3d 614 (11th Cir.1995). In *Florida Power*, the court found that a genuine issue of fact existed as to whether the filed rate in question covered the service that plaintiff sought to buy. *Id.* at 615. The plaintiff in *Florida Power* had agreed to purchase certain "point-to-point" power transmission services from defendant Florida Power & Light. The rates for these services were filed with the Federal Energy Regulatory Commission, which has sole authority to determine power allocations and the reasonableness of wholesale power rates. *Id.* In addition, plaintiff desired to purchase certain "network" trans-

mission services that would allow it to switch to other power sources throughout the day, saving plaintiff considerable money. Florida Power, however, refused to sell network service to plaintiff. *Id.* at 615. Florida Power contended that plaintiff's request for a network tariff was nothing more than a request to modify the existing point-to-point tariff, which was unenforceable. Plaintiff, on the other hand, insisted that network service is so distinct from point-to-point service that a separate tariff had to be filed. The plaintiff did not dispute that if there was a filed rate covering the requested "network" service, its damage claim would be precluded by the filed rate doctrine. *Id.* at 616. The dispute arose, however, as to whether or not there was a rate on file that covered the ordered service. The court concluded that there needed to be a factual determination of whether network transmission is such a different product from point-to-point transmission that reasonable rate-making would require the filing of separate network transmission rates. *Id.* Specifically, the court found that it would be acceptable to estimate damages from the refusal to sell the less expensive network service in the context of antitrust damages, where damage estimates are nearly unavoidable. *Id.* at 616.

*Florida Power,* however, is inapplicable on its facts and does not address the concerns presented in this case. First, *Florida Power* involved antitrust claims against a public utility. Second, the plaintiff did not seek to force the defendant to file a different tariff, nor did it seek to enforce a contract for a lower, discriminatory rate. Indeed, antitrust concerns were central to the court's holding and the court expressed concern that the utility would attempt to use the filed rate doctrine to confer immunity from antitrust scrutiny. *Id.* at 616. As such, *Florida Power* is not instructive in this instance.

For the reasons set forth above, therefore, the Court is unable to provide the relief Fax

---

to warn or notify the agency when outside callers were fraudulently accessing HRA's remote access lines. Despite the limitation of liability provisions in the applicable tariff, HRA claimed that the limitation of liability did not apply because of AT & T's willful misconduct in failing to investi-

gate or warn of the fraud. The Court granted summary judgment to AT & T upon a finding that no evidence was presented to indicate that AT & T intentionally or recklessly failed to notify the defendant of the problems leading to the increased amount of the invoices. *Id.* at 975.

seeks. It cannot enforce a contract for an unfiled rate, nor can it assess whether the rates allegedly contracted for are reasonable and whether they can be used to assess damages. Moreover, the Court notes that Fax knowingly used and was billed for CustomNet service. Accordingly, AT & T's motion for summary judgment·is granted as to Fax's claims to either enforce the January 14, 1994 ATQ or provide damages based on the proposed Conquest tariff. In addition, summary judgment is granted in favor of AT & T on its counterclaim for $2,321,390.71.

As a final note, however, the Court must address Fax's request for relief concerning the installation of the T1 pipe. To the extent that Fax alleges a contract to install the T1 pipe and that Fax delivered to AT & T a down payment for such service, these issues are not barred by the filed rate doctrine. The enforcement or assessment of damages of such a contract, if found to exist, would neither require the Court to assess the reasonableness of a telecommunications rate nor discriminate in pricing among customers. On this limited issue, therefore, AT & T's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part AT & T's motion for summary judgment. Specifically, the Court hereby:

1. GRANTS defendant AT & T's motion for summary judgment as to the enforceability of the January 14, 1994 ATQ.

2. GRANTS defendant AT & T's counterclaim in the amount of $2,321,390.71.

3. DENIES defendant AT & T's motion for summary judgment as to the contract to install T1 pipe.

SO ORDERED.