**AT & T CORP.**

v.

**JMC TELECOM, LLC, Appellant.**

No. 05–1304.

United States Court of Appeals, Third Circuit.

Argued on March 7, 2006.

Opinion Filed Dec. 1, 2006.

Joseph R. Guerra, Esquire (Argued), Sidley Austin, Washington, DC, Richard H. Brown, III, Esquire, Pitney Hardin, Morristown, NJ, for Appellee.

Joseph M. Alioto, Esquire (Argued), Alioto Law Firm, San Francisco, CA, Gil D. Messina, Esquire, Cassidy, Messina, & Laffey, Holmdel, NJ, Russell F. Brasso, Esquire, Foreman & Brasso, San Francisco, CA, for Appellant.

Before: GREENBERG and ROTH *, Circuit Judges, BUCKWALTER **, District Court Judge.

## OPINION

ROTH, Circuit Judge:

JMC Telecom, L.L.C., was a wholesaler, marketer, and designer of prepaid telephone cards with experience in the maritime market.[1] This appeal arises from a suit for breach of contract brought by AT & T Corporation against JMC. JMC counterclaimed for antitrust, federal common law, and state law violations. The District Court dismissed the antitrust counterclaim and granted summary judgment to AT & T on its contract claims and against JMC on its remaining counterclaims. For the reasons stated below, we will affirm the decision of the District Court.

## I. Background

In September 1998, AT & T and JMC entered into an agreement under which AT & T would provide prepaid calling services to JMC and JMC in turn would sell the services as prepaid telephone cards to end-users in the maritime market.[2] The maritime sector represented a new market for AT & T and, more importantly, a way to expand its business in the international market for prepaid phone cards, which give the end-user a preset amount of telecommunications services. According to JMC, the two companies had an implicit agreement that restricted JMC's sales territory for the cards to the maritime sector.

AT & T and JMC executed four documents to set up the agreement: the Contract Tariff Order Form, the Professional Services Agreement, Contract Tariff No. 10344, and an Addendum. The documents outlined the price JMC would pay for the telecommunications services behind the cards, as well as establishing a minimum annual revenue commitment (MARC) on the part of JMC. The Professional Services Agreement provided that JMC would design and print the cards while AT & T would provide funding in part for card production. The Addendum stated that, if a business downturn beyond JMC's control caused JMC to fail to meet the MARC, the parties would cooperate to develop a mutually agreeable solution.

In accordance with federal law, AT & T filed with the Federal Communications Commission (FCC) the executed Contract Tariff Order Form, Contract Tariff No. 10344, and AT & T FCC Tariff No. 1, which was a tariff previously filed with the FCC by AT & T and which was referred to in the other two documents. The Adden-

---

* Judge Roth assumed senior status on May 31, 2006.

** Judge Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. JMC is no longer in business.

2. The maritime market consists of foreign ships and their crew members and cruise ships and their passengers.

dum was never filed with the FCC despite AT & T's alleged promise to do so. In addition, JMC asserts that, pursuant to Contract Tariff No. 10344 and AT & T Tariff No. 1, AT & T would be the exclusive provider of the services needed to complete calls using the cards. CT 10344 lists "Other Participating Carriers" as "NONE."

JMC soon developed concerns with both the quality of service provided by AT & T and the cards themselves. Specifically, JMC contends that the cards were often printed with duplicate identification numbers and incorrect instructions for foreign origination calls, *i.e.,* calls between two foreign countries.[3] JMC estimated that sales of the cards fell by 50% because of the problems with foreign origination calls. Moreover, cardholders complained about AT & T's customer service, or lack thereof. Finally, users were frequently unable to complete calls from the United States to the Philippines, which was one of the more important selling points of the cards. JMC estimated that it lost 25% of its business due to the initial problems in completing calls to the Philippines. This particular problem was corrected after AT & T switched card traffic away from the original local country carrier, Pacific Gateway Exchange (Pacific).

Per the agreement, AT & T sent JMC invoices for its services. AT & T received a one-time, partial payment on November 2, 1998, of $400,000. JMC made no further payments to AT & T.

Due to JMC's concerns with service and other related problems, JMC sought more competitive rates from AT & T. The negotiations pursuant to the Addendum were unsuccessful, and AT & T filed a complaint against JMC on June 4, 1999, *for the* balance owed from cards already sold and the amount JMC owed under the MARC. JMC filed a counterclaim, alleging violations by AT & T of state law, the Sherman Act, and federal common law.[4] The District Court dismissed JMC's antitrust counterclaim under FED.R.CIV.P. 12(b)(6) and granted summary judgment pursuant to FED. R. CIV. P. 56(c) on AT & T's complaint and against JMC on all of its remaining counterclaims.[5] This appeal followed.

## II. Jurisdiction and Standard of Review

The District Court had original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1337, and 15 U.S.C. §§ 15 and 26. Also, the District Court had supplemental jurisdiction over JMC's state law claims under 28 U.S.C. § 1367. We have jurisdiction over the District Court's grant of

---

**3.** The meaning of "foreign origination" is in dispute. For purposes of this appeal, we accept JMC's proffered definition-calls between two foreign, *i.e.,* non-U.S., states. Also, for purposes of this appeal, we assume that any errors in the instructions were caused by AT & T.

**4.** After AT & T filed its complaint in this action, JMC filed a complaint against AT & T in the United States District Court for the Eastern District of New York. *See JMC Telecom, LLC v. AT & T Corp.,* 99–cv–03710–SJ–MDG (E.D.N.Y.1999). The District Court of New Jersey enjoined JMC from prosecuting

the action in the Eastern District of New York. JMC sought a writ of mandamus, which we denied. *See AT & T Corp. v. JMC Telecom, LLC,* 254 F.3d 1078 (3d Cir.2001). JMC filed a petition for a writ of certiorari with the Supreme Court, which it denied. *See JMC Telecom, LLC v. AT & T Corp.,* 534 U.S. 822, 122 S.Ct. 56, 151 L.Ed.2d 25 (2001).

**5.** Some of JMC's additional state law counterclaims were dismissed pursuant to FED R. CIV. P. 12(b)(6). JMC does not refer to these claims in its appeal; therefore, they are not before us.

summary judgment and motion to dismiss pursuant to 28 U.S.C. § 1291.

The standard of review for a motion to dismiss is plenary. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). When considering an appeal from a dismissal of a complaint pursuant to Rule 12(b)(6), we accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn from them and view them in the light most favorable to the nonmoving party. *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

The standard of review from a grant of summary judgment is plenary. *Gottshall v. Consol. Rail Corp.,* 56 F.3d 530, 533 (3d Cir.1995). Summary judgment is only appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R.CIV.P. 56(c). In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party. *Gottshall,* 56 F.3d at 533.

## III. Discussion

### A. Antitrust Claim: Violation of 15 U.S.C. § 1

■ Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Before the District Court, JMC asserted two violations of the Sherman Act by AT & T which caused JMC to suffer an antitrust injury.[6] First, AT & T violated the Sherman Act by refusing to lower the rates assessed to JMC pursuant

to the Addendum. Second, AT & T violated the Sherman Act by forcing JMC to participate in a scheme to divide the market between maritime and non-maritime customers. This second argument is the one stressed by JMC on appeal. Specifically, JMC contests the District Court's finding that the restraint at issue was vertical, *i.e.,* between a supplier and distributor, rather than horizontal, *i.e.,* between two companies on the same level of production. Unless the restraint is horizontal, however, JMC's claims fail.

We find both of JMC's arguments to be unpersuasive. In regard to the first, the Supreme Court has ruled that:

> Section 1 of the Sherman Act requires that there be a "contract, combination ... or conspiracy" between the manufacturer and *other distributors* in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.

*Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (emphasis added). This Court has interpreted Monsanto to impose a requirement on the distributor to come forward with evidence that tends to exclude the possibility that the supplier acted independently. *See Arnold Pontiac–GMC, Inc. v. Budd Baer Inc.,* 826 F.2d 1335, 1338 (3d Cir.1987). Here, JMC has not alleged action by other distributors in concert with AT & T. As such, JMC's argument fails because it has alleged only unilateral action by AT & T. Such action cannot serve as a violation of the Sherman

---

**6.** AT & T argues that JMC failed to allege that it suffered an antitrust injury and, as such, failed to state a cause of action. Since JMC fails to state a violation for other reasons, we do not reach this issue.

Act. *Monsanto*, 465 U.S. at 761, 104 S.Ct. 1464.

 JMC's second argument is that AT & T violated the Sherman Act by prohibiting JMC from selling the cards to non-maritime customers. Vertical, non-price restraints imposed by the supplier are analyzed under the rule of reason standard.[7] *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). At oral argument, JMC stipulated that it would not bring a claim under the rule of reason; rather, JMC argued that the arrangement between AT & T and JMC was a *per se* violation of the Sherman Act. According to JMC's argument, the agreement between the two companies represented a horizontal, rather than vertical, restraint. Since horizontal restraints are a *per se* violation of the Sherman Act, JMC would not need to allege a violation of the rule of reason.

 The problem with JMC's argument, however, is that the relationship was primarily vertical. Although we agree that the relationship had horizontal elements, it is undisputed that AT & T supplied telecommunications service to JMC for resale. The fact that AT & T also sold phone cards at the resale level does not change the analysis. Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level, *i.e.*, have some form of horizontal relationship (a/k/a/ dual distributor arrangement), as is the case here. *Elecs. Commc'ns Corp. v. Toshiba Am. Consum-*

*er Prods.*, 129 F.3d 240, 243–44 (2d Cir. 1997) (marshaling authority from the Sixth, Seventh and Tenth Circuits, as well as guidelines from the Department of Justice in finding that such restraints are not *per se* violations of the Sherman Act).

We conclude that *Electronics Communications* represents the best way for analyzing such arrangements and is consistent with the Supreme Court's observation that it is slow "to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). JMC could have argued that the restraint at issue ought to be analyzed under the traditional rule of reason rather than attempt to squeeze the restraint into the *per se* realm.[8] JMC, however, did not. Accordingly, JMC failed to state a claim pursuant to the Sherman Act. The District Court properly dismissed the antitrust claim.

## B. JMC's Federal Common Law Claims

 On appeal, JMC also asserts two federal common law counterclaims against AT & T: breach of Tariff No. 1, and breach of the Contract Tariff.[9] Many of JMC's claims are derived from the quality, or lack thereof, of service provided by AT & T to cardholders. Specifically, JMC alleges that AT & T did not provide JMC with the "world class dependability" that is

---

7. When conducting a rule of reason inquiry, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Bus. Elecs. Corp.*, 485 U.S. at 723, 108 S.Ct. 1515 (quoting *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)).

8. At oral argument, JMC's counsel stipulated that "[w]e specifically have claimed a *per se* case, only."

9. Federal common law creates a cause of action for breach of a communications contract. *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir.2003).

expected from AT & T and, generally, provided poor customer service. These claims, however, are barred by the filed rate doctrine.

■ The Federal Communications Act requires that common carriers, such as AT & T, file "schedules showing all charges for itself and its connecting carriers." 47 U.S.C. § 203(a). The schedule must show the classifications, practices, and regulations affecting the charged rates. *Id.* The carrier shall not "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." 47 U.S.C. § 203(c). According to the filed rate doctrine, a customer is prevented from enforcing contract or tort rights that contradict the tariff. *AT & T v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 226, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (noting that "[r]espondent can no more obtain unlawful preferences under the cloak of a tort claim than it can by contract"). The classic example of the preemptive power of the doctrine occurs when a customer makes a claim for a rate that was not filed by the carrier—such claims are barred.

■ JMC claims that AT & T did not grant lower rates to JMC pursuant to the Addendum. The Addendum, however, was never filed with the FCC. As such, the Addendum is a contractual right that contradicts the tariff; the tariff establishes a set-price that the Addendum effectively limits and calls into question. Consequently, the Addendum cannot afford a privilege, *i.e.*, a lower rate, to JMC. Moreover, the fact that AT & T allegedly agreed to file the Addendum provides no recourse to JMC; otherwise, the filed rate

doctrine would have no import vis-à-vis its goals of transparency and non-discrimination of rates. *Id.* at 222, 118 S.Ct. 1956 (arguing that the carrier's intentional misrepresentations are irrelevant).

■ Furthermore, the filed rate doctrine has been expanded to exclude claims of insufficient and poor-quality service:

> Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. If discrimination in charges does not include non-price features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge.... An unreasonable discrimination in charges, that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price.

*Id.* at 233, 118 S.Ct. 1956 (citations and internal quotations omitted). Here, JMC is claiming poor customer service in areas, such as customer support, that are not spelled out in the tariff. As such, JMC's claims of poor service are barred by the filed rate doctrine.[10]

■ The District Court also rejected JMC's claim that AT & T breached the tariff by not providing foreign origination capability on the grounds that JMC admitted in an e-mail that the "customer who uses the card outside the country always connects with the network." The email in question, however, is highly ambiguous, and it is unclear whether the context of the message was foreign origination calls or another, non-germane topic.

---

**10.** JMC cites *AT & T v. NOS Communications, Inc.*, 830 F.Supp. 225 (D.N.J.1993), in support of its claim. *NOS*, however, pre-dates the Supreme Court's articulation of the doctrine's expansive reach in *AT & T v. Central Office Telephone, Inc.*

Nonetheless, JMC's argument still fails. The record illustrates that the problem with foreign origination stemmed from the fact that the cards "did not have the proper written instruction on how to (make such a call)." The quality of the written instruction on the cards, and the corresponding "ease of use," is beyond the terms of the tariff. Moreover, "ease of use" is potentially a method by which a carrier can introduce discrimination between customers. As such, JMC's argument is, again, one of quality of service beyond the scope of the filed tariff and, consequently, is banned by the filed rate doctrine.[11] *Id.*

■ On appeal, JMC has stressed that many of its claims seek to enforce promises made pursuant to the filed rate, rather than promises to generate an additional benefit. In this connection, JMC claims that AT & T breached the tariff by not serving as the exclusive provider of services to the Philippines and but instead by relying on Pacific.

Contract Tariff No. 10344 lists "other participating carriers" as "NONE." 47 C.F.R. § 61.3(z) defines an "other participating carrier" as a "carrier subject to the (Federal Communications) Act that publishes a tariff containing rates and regulations applicable to the portion o[f] (sic) through service it furnishes in conjunction with another subject carrier." JMC claims that AT & T breached this provision because Pacific was an undeclared "other participating carrier."

The District Court rejected JMC's argument. First, the District Court examined Pacific's actual filed tariff with the FCC.

The District Court found that, since Pacific's filed tariff only pertained to international direct dial service and Pacific did not provide international direct dial service to customers in this case, the tariff does not contain "rates and regulations applicable" to the service Pacific provided to AT & T. Consequently, Pacific was not a participating carrier and, therefore, did not need to be listed on AT & T's tariff.

We disagree with the District Court's reasoning, but we nonetheless reach the same result. Specifically, the International Services Termination Agreement between AT & T and Pacific provides that the Pacific will supply AT & T with "international direct dial voice, fax or data communication." Simply put, the International Services Termination Agreement is not reconcilable with the District Court's rationale.

A better method of analyzing whether Pacific was a participating carrier is to consider the parties' relationship in terms of "end-on-end" versus "end-to-end" transmission set-ups.

An "end-on-end" service arrangement is one in which each carrier participating establishes a separate rate for its segment of the service. *See Offshore Tel. Co. v. South Cent. Bell Tel. Co.*, 2 FCC Rcd. 4545, ¶ 13 n. 10 (1987). In an "end-to-end" arrangement, the carriers establish a rate for the entire transmission and the customer pays a single uniform rate to one carrier for completing a call. *Id.* For example, in *In the Matter of AT & T Commc'ns Revisions to Tariff F.C.C. Nos. 9 and 10*, 2 FCC Rcd 100, 1987 WL 343876 (1987), AT & T was

---

11. Although the filed rate doctrine produces harsh results in this case as alleged, such equitable concerns have been rejected by the Supreme Court. *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 128, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (noting that "[d]espite the harsh effects of the filed rate doctrine, we have consistently adhered to it."). This is true regardless of AT & T's ulterior motives. *See Cent. Off. Tel.*, 524 U.S. at 223, 118 S.Ct. 1956.

allowed to de-list an Alaskan company, Alascom, as a participating carrier on its filed tariff. Previously, the two companies "provided interstate private line service on an end-on-end bases, each maintaining its own rates and tariffs for the private line service that it provided." *Id.* at ¶ 2 (footnote omitted). In response to an antitrust suit, AT & T changed the arrangement so that all its customers received the same rate for calls into Alaska regardless of whether they used Alascom or a competing service; hence, the companies now had an end-to-end arrangement with one rate for the service provided to the consumer. *In the Matter of AT & T Communications Revisions to Tariff F.C.C. Nos. 9 and 10,* 1985 WL 260380, 1985 FCC Lexis 2096, ¶ 7 (1985). As was the case with Alascom after the change in service, the price JMC card users paid is not a direct function of Pacific's price and, therefore, AT & T need not list the carrier as an other participating carrier.[12]

Given the FCC's role in interpreting the FCA, the aforementioned decisions deserve *Chevron*-style deference. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.,* 545 U.S. 967, 125 S.Ct. 2688, 2699, 162 L.Ed.2d 820 (2005) (noting that "we apply the *Chevron* framework to the Commission's interpretation of the (Federal) Communications Act"); *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct.

2778, 81 L.Ed.2d 694 (1984). In contrast, JMC's proffered expert witness testimony regarding the definition of "other participating carrier" is unpersuasive because the question is one of law and because her testimony did not elaborate on how the term "participating carrier" has been defined by the FCC.

Returning to the text of 47 C.F.R. § 61.3(z), Pacific did not publish a rate applicable to the portion of through service it provided to AT & T for JMC traffic because the rate was not separate as is characteristic of an end-to-end relationship. As such, Pacific was not an "other participating carrier," and, consequently, AT & T did not violate the tariff by failing to list Pacific.

■ Finally, to the extent that JMC claims that AT & T orally represented that it would provide JMC with exclusive AT & T service, such a claim is one for quality of service and is barred by the filed rate doctrine.[13]

## C. JMC's State Law Claims

JMC asserted four state law counterclaims against AT & T that were dismissed at summary judgment: breach of contract, fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. The District Court found that each of the counterclaims was preempted by federal law. In the alternative, the District Court found that JMC's

---

**12.** *In the Matter of AT & T Co. Application for Authority Pursuant to Section 214,* 11 FCC Rcd 5396, 1996 WL 80039 (1996) is also illustrative. AT & T wanted to provide end-to-end service to the ship-to-shore communications market, which is governed by a different statutory regime. Comsat objected to the application on the grounds that end-to-end service would be inconsistent with a participating carrier system, which it claimed was the governing structure for the market. The FCC noted that Comsat and other carriers

had been allowed to deviate from a purely participating carrier arrangement because they had been allowed to bill collectively, *i.e.* one company bills for the service provided by a group of companies. *Id.* at ¶ 13.

**13.** In so much as this is a claim for fraud, the allegation is also barred by the filed rate doctrine. *See Fax Telecomm. v. AT & T,* 952 F.Supp. 946, 952 (E.D.N.Y.1996), *aff'd* 138 F.3d 479 (2d Cir.1998).

state law claims were barred by the filed rate doctrine.

 We agree with the District Court in that JMC's state law claims are barred by the filed rate doctrine. First, there is no fraud exception to the filed rate doctrine. *Fax Telecomm.*, 952 F.Supp. at 952 (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 22 (2d Cir.1994)). Similarly, JMC's claim of negligent misrepresentation fails; to rule otherwise would "force the courts to determine what the reasonable rate would be in order to assess damages" and, therefore, violate the filed rate doctrine. *Fax Telecomm.*, 952 F.Supp. at 952; *also Marcus v. AT & T Corp.*, 138 F.3d 46, 60 (2d Cir.1998) (noting that the task of determining a reasonable rate is reserved to the exclusive province of the FCC). Also, enforcement of the duty of good faith and fair dealing would impermissibly enlarge the rights as defined by the tariff. *Cent. Off. Tel.*, 524 U.S. at 227, 118 S.Ct. 1956 (finding a claim for breach of the implied covenant of good faith and fair dealing to be barred). As such, the claim is preempted by the filed rate doctrine.

Finally, JMC's claim of breach of contract under state law mirrors its claim under federal common law. Both seek to enforce the terms of the tariff. Consequently, and for the reasons previously espoused, JMC's state law claim for breach of contract necessarily fails.

### D. Summary Judgment for AT & T for Breach of Tariff Terms

We agree with the District Court in that JMC has failed to show that it should be excused from its contractual obligation to pay AT & T according to the tariff terms. JMC's defenses, much like its counterclaims, are based on AT & T's alleged breaches, which, as previously discussed, are barred by the filed rate doctrine. Since the material facts supporting AT & T's breach of tariff claim are not in dispute, summary judgment in favor of AT & T was appropriate.

## IV. Conclusion

For the reasons discussed above, we will affirm the District Court's order dismissing JMC's antitrust claim. We will affirm the District Court's grant of summary judgment in favor of AT & T and against JMC on the remaining claims and counterclaims.